UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TAVION WILLIAMS,

        Plaintiff,

    v.                                        Case No. 23-C-45

CITY OF APPLETON,
JOHN OSTERMEIER, and
AARON PYNENBERG,

        Defendants.

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Tavion Williams brought this 42 U.S.C. § 1983 action against Defendants Appleton Police Department Sergeants John Ostermeier and Aaron Pynenberg and the City of Appleton, asserting that the officers violated his Fourth Amendment rights when they ordered him out of his car on March 16, 2020. In particular, Williams claims that Sergeants Ostermeier and Pynenberg lacked reasonable suspicion to ask him to exit the vehicle in which he was a passenger and sole occupant and that one or both of them failed to intervene to prevent the violation of his rights. Williams also sued the City of Appleton based on its duty to indemnify the officers pursuant to Wis. Stat. § 895.46 for their liability arising out of their employment. The court has jurisdiction over Williams' civil rights claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the indemnification claim pursuant to 28 U.S.C. § 1367. This matter comes before the court on Defendants' motion for summary judgment and Williams' cross-motion for partial summary judgment. For the following reasons, Defendants' motion for summary judgment will be partially granted and Williams' motion will be denied.

## BACKGROUND

Sergeants Ostermeier and Pynenberg were on duty for the Appleton Police Department the morning of March 16, 2020.  Defs.' Proposed Findings of Fact (DPFOF) ¶¶ 2–5, Dkt. No. 26.  At approximately 9:14 a.m., Sergeant Ostermeier was dispatched to the 2600 block of Harmon Street in Appleton, Wisconsin for a report of a suspicious vehicle.  *Id.* ¶ 7.  Dispatch informed Sergeant Ostermeier that a caller reported that an older Buick had driven around the block and parked on the street.  *Id.* ¶ 8.  The caller further reported that a female exited the vehicle while a second person remained in the car.  *Id.* ¶ 9.  Sergeant Pynenberg was also dispatched to respond to the area as a backup officer to Sergeant Ostermeier, and dispatch provided him with the same information about the vehicle.  *Id.* ¶¶ 10–12.  The officers had not received reports that the individuals in the Buick had committed a crime.  Pl.'s Proposed Findings of Fact (PPFOF) ¶¶ 15, 41, Dkt. No. 24.

Dispatch had previously informed Sergeant Ostermeier that another officer had attempted to conduct a traffic stop earlier that morning, but the vehicle had fled.  DPFOF ¶¶ 13–14; PPFOF ¶ 9.  Sergeant Ostermeier knew that the incident led to a search for the subject vehicle, which was eventually located at approximately 8:00 a.m. in an elementary school parking lot two blocks from the 2600 block of Harmon Street.  DPFOF ¶¶ 15–16, 18; PPFOF ¶ 10.  School staff had seen two individuals leave the car walking west, and Sergeant Ostermeier knew that the two suspects had not yet been located.  DPFOF ¶¶ 17, 19; PPFOF ¶ 11.  Sergeant Ostermeier had been assisting in the search for the suspects that fled the vehicle before being dispatched to the 2600 block of Harmon Street.  PPFOF ¶ 12.

The 2600 block of Harmon Street is a residential area with houses, residential streets, and sidewalks.  *Id.* ¶ 17.  Sergeant Ostermeier had patrolled the area for many years and described the

area as a "very residential, probably low-crime area." *Id.* ¶ 18; Ostermeier Dep. 46:03–21, Dkt. No. 17-2. While responding to the 2600 block of Harmon Street, Ostermeier had concerns that the report about the suspicious Buick may be connected to the prior attempted traffic stop and that the Buick may have been looking to pick up the suspects of the abandoned vehicle. DPFOF ¶¶ 20–21. Based on his training and experience, Sergeant Ostermeier knew that when suspects flee police on foot, they often hide out or wait for someone to pick them up. *Id.* ¶ 126. He also knew that one occupant leaving a parked vehicle on foot with another occupant remaining in the vehicle is indicative of drug dealing, human trafficking, prostitution, and other illicit activity. *Id.* ¶ 125; PPFOF ¶ 68.

When Sergeant Ostermeier arrived at the 2600 block of Harmon Street driving southbound, he observed a parked Buick facing northbound. DPFOF ¶¶ 23–24. As he passed the vehicle, Sergeant Ostermeier observed that an adult male, later identified as Williams, was seated in the passenger seat of the running Buick and the driver seat was unoccupied. *Id.* ¶¶ 25–26. Sergeant Ostermeier made a U-turn to face northbound and parked his squad car behind the vehicle. *Id.* ¶ 27. He called in the license plate, which returned on a 1999 Buick Lesabre registered to Nakeysha Alexander-Haywood, and notified dispatch that the vehicle was occupied by a single person. *Id.* ¶ 29; PPFOF ¶ 29. Sergeant Ostermeier never activated his lights or siren. PPFOF ¶ 30.

Sergeant Pynenberg also arrived on scene approximately 40 seconds after Sergeant Ostermeier and parked his squad car behind Sergeant Ostermeier's. DPFOF ¶ 31; PPFOF ¶ 36. According to the officers, Williams slouched or ducked down in the car, and the officers could only see the top of his head. DPFOF ¶¶ 30, 32, 45. Sergeant Ostermeier saw Williams' head disappear from view, and he believed this was suspicious because he thought Williams might be

3

trying to access something in the vehicle. PPFOF ¶¶ 32–33. Williams contends he was sleeping in the Buick. Pl.'s Resp. to Defs.' Proposed Findings of Fact ¶ 30, Dkt. No. 31.

After exiting his squad car, Sergeant Ostermeier stood behind his driver-side door. PPFOF ¶ 31. Sergeant Pynenberg joined Sergeant Ostermeier in the front of Sergeant Ostermeier's squad car. DPFOF ¶ 36. When he arrived, Sergeant Pynenberg was unaware of the other vehicle that had fled an officer and been abandoned at the elementary school. PPFOF ¶ 37. Sergeant Ostermeier told Sergeant Pynenberg that Williams had hunched down in the car. *Id.* ¶ 44. Sergeant Pynenberg claims that this made him suspicious because he believed Williams was conspicuously ignoring the officer's presence. *Id.* ¶ 45. He was also concerned that Williams could be having a medical event, such as an overdose, or was planning on ambushing the officers with firearms. DPFOF ¶ 51; PPFOF ¶ 50. After the officers had been standing behind the Buick for approximately one minute, Sergeants Pynenberg and Ostermeier observed Williams sit up in the car, look back towards them, and make eye contact. DPFOF ¶ 36; PPFOF ¶ 56.

The officers agreed that they should have Williams step out of the Buick. After deciding to ask Williams to exit the Buick, Sergeant Ostermeier raised his hand and motioned for Williams to exit the vehicle, and Sergeant Pynenberg verbally instructed Williams to step out of the vehicle with his hands up. DPFOF ¶¶ 52–53; PPFOF ¶ 60. Williams exited the passenger side of the Buick and began walking back toward the officers with his hands raised, and the officers approached Williams at the rear of the Buick. PPFOF ¶ 63; DPFOF ¶ 55. As Sergeant Ostermeier approached Williams, he stated, "It's just kind of strange, we pull in behind you and looked like you were ducking down in the car." PPFOF ¶ 76. As Williams approached, Williams moved his hands toward his pockets, and Sergeant Ostermeier again instructed him to put his hands up. DPFOF ¶ 57; PPFOF ¶ 77. Williams explained that he was laying down in his backseat and that

4

his friend had left the vehicle and walked around the block to visit her cousin. PPFOF ¶¶ 78–79, 81.

Sergeant Pynenberg asked Williams if he could look inside the Buick. *Id.* ¶ 84. Williams did not answer but instead began walking with Sergeant Pynenberg to the Buick. *Id.* ¶ 85. Sergeant Pynenberg then ordered Williams to stay where he was. *Id.* ¶ 86. While Sergeant Pynenberg approached the passenger side of the Buick, Sergeant Ostermeier spoke with Williams and asked Williams for an ID card. DPFOF ¶ 59; PPFOF ¶ 92. After Williams indicated that he did not have an ID on his person, Williams identified himself to Sergeant Ostermeier as "Tavion," and he was later identified as Tavion Williams. PPFOF ¶ 93; DPFOF ¶¶ 60–61. As he approached the passenger side of the Buick and looked through the open window, Sergeant Pynenberg observed a strong odor of marijuana coming from inside the vehicle. DPFOF ¶ 62. Sergeant Pynenberg returned to Williams and asked him what the inside of the car smelled like. *Id.* ¶¶ 63–64. Williams responded that it smelt like "weed." PPFOF ¶ 100. At that point, Sergeant Ostermeier informed Williams that he would be detained and placed Williams in handcuffs behind his back before escorting him to his squad car. DPFOF ¶¶ 66–68.

Outside of the squad car, Sergeant Ostermeier began to search Williams before placing him in the squad. *Id.* ¶ 69. He removed items from Williams' person and placed them in a bag. *Id.* ¶ 70. Sergeant Ostermeier found and removed a large clump of cash from Williams' front left pants pocket, where he also observed a plastic bag containing a white, powdery substance, which he did not remove with the money. *Id.* ¶¶ 71–72. Instead, he went to his trunk to retrieve another bag while Sergeant Pynenberg held on to Williams. *Id.* ¶ 73. While retrieving the additional bag, Sergeant Ostermeier observed Williams twisting around and digging his handcuffed hand into his left front pocket. *Id.* ¶ 74. Sergeant Ostermeier took hold of Williams' left arm and attempted to

5

pull his hands away from the pocket, but Williams tensed up and resisted Sergeant Ostermeier's efforts. *Id.* ¶¶ 75–76. Eventually, Sergeant Ostermeier was able to remove Williams' hand from his pocket and observed that Williams' hand was balled up, which led him to believe that the bag with the powdery substance was in Williams' hand. *Id.* ¶¶ 77–79. Sergeant Ostermeier continued to hold on to Williams' left side as he continued to tense and pull against him. *Id.* ¶ 80. Sergeant Ostermeier was able to trip Williams' legs and bring him to the ground on his stomach. *Id.* ¶ 81. While on the ground, Williams continued to tense up and reach, as though he were trying to obtain an object. *Id.* ¶ 82. Sergeant Ostermeier placed his knee on Williams' shoulder blade area and grabbed Williams' left hand. *Id.* ¶ 83. Sergeants Ostermeier and Pynenberg checked Williams' fisted hands and did not locate any objects. *Id.* ¶ 84.

During the struggle, Sergeant Ostermeier requested additional backup, which arrived while Williams was on the ground. *Id.* ¶¶ 85–86. Officers placed a hobble restraint on Williams' legs, and Sergeant Ostermeier continued to search Williams' person, where he located another large wad of cash and a dollar store receipt in Williams' front right pocket. *Id.* ¶¶ 87–89. Officers searched the surrounding area and did not locate the bag Sergeant Ostermeier had previously observed in Williams' front left pocket. *Id.* ¶¶ 90–91. Sergeant Ostermeier believed that Williams may have been able to toss the bag away from him during the struggle. *Id.* ¶ 92.

Williams was placed under arrest and put in the back of Sergeant Ostermeier's squad car. *Id.* ¶¶ 93–94. Once inside the squad car, Williams commented that the substance in his pocket was marijuana. *Id.* ¶ 95. Sergeant Ostermeier then read Williams his Miranda rights, and Williams confirmed that he understood those rights. *Id.* ¶¶ 96–97. Sergeant Ostermeier transported Williams to the Appleton Police Department, and Sergeant Pynenberg followed in his own squad car. *Id.* ¶¶ 98–99. The other officers remained on the scene and conducted a search of the Buick.

*Id.* ¶¶ 100–01. Officers located multiple items of drug paraphernalia inside the Buick, including two bags of plant material consistent with marijuana, one bag consistent with cocaine, and a digital scale. *Id.* ¶ 102.

Williams was charged with possession of cocaine, possession with intent to manufacture/deliver THC, possession of drug paraphernalia, and resisting or obstructing an officer in Calumet County. *Id.* ¶¶ 103–05. His attorney filed a motion for suppression of evidence, arguing that the officers violated Williams' Fourth Amendment rights by instructing him to exit the Buick without reasonable suspicion. *Id.* ¶¶ 107–08. Following an evidentiary hearing, the Calumet County Circuit Court found that the officers lacked reasonable suspicion to instruct Williams to exit the vehicle and granted the motion to suppress. *Id.* ¶¶ 109, 113–14. The charges were thereafter dismissed. *Id.* ¶ 115.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The fact that the parties filed cross-motions for summary judgment does not alter this standard. In evaluating each party's motion, the court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (cleaned up). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from

7

what actually happened," a court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citation omitted).

## ANALYSIS

### A. Seizure

Williams argues that Sergeants Ostermeier and Pynenberg violated his Fourth Amendment right to be free from unreasonable seizures. Sergeants Ostermeier and Pynenberg do not dispute that they seized Williams when they instructed him to exit the Buick and Williams complied. They nevertheless argue that they had reasonable suspicion for the seizure.

The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. This protection "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). To conduct a lawful stop, an officer must have "a reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also United States v. Place*, 462 U.S. 696, 704 (1983) ("In *Terry*, we described the governmental interests supporting the initial seizure of the person as effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." (internal quotations omitted)); *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation

8

that the person stopped is, or is about to be, engaged in criminal activity."). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation altered).

A reasonable suspicion means "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18. A "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a stop. *Terry*, 392 U.S. at 21–22. Judges must "evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Id.* "[T]he facts [must] be judged against an objective standard." *Id.* "But we must not be overly focused on any one factor. The proper analysis involves a consideration of the totality of the circumstances known to the officers at the time of the stop." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) (internal quotation marks and citation omitted). "The totality of the circumstances includes the experience of the law enforcement agent and the behavior and characteristics of the suspect." *Id.* (internal quotation marks and citation omitted). "The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (internal quotation marks and citation omitted). Rather than demand scientific certainty, courts "must permit officers to make commonsense judgments and inferences about human behavior." *Id.*

As a preliminary matter, Williams concedes that, because the Calumet County Circuit Court's ruling on the issue of reasonable suspicion is not binding on this court, the doctrine of issue preclusion does not bar Defendants from litigating this case. Pl.'s Resp. Br. at 6, Dkt. No.

9

33. Notwithstanding the state court's conclusion to the contrary, Defendants maintain that, based on the totality of the circumstances, Sergeants Ostermeier and Pynenberg had reasonable suspicion to instruct Williams to exit the vehicle.

Defendants contend that Sergeants Ostermeier and Pynenberg received a report of a suspicious vehicle and that, when they arrived on the scene, they observed a vehicle matching the description of the vehicle given to them by dispatch. Although a report of a "suspicious vehicle" by itself is insufficient to support a finding of reasonable suspicion, *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010), Defendants argue that, together with the totality of the facts known to Sergeants Ostermeier and Pynenberg at the time, the officers were justified in instructing Williams to exit the Buick. Defs.' Br. at 15–16, Dkt. No. 25 (citing *Green v. Newport*, 868 F.3d 629, 634–35 (7th Cir. 2017)). Defendants offer three specific and articulable facts from which Sergeants Ostermeier and Pynenberg reasonably could have inferred that criminal activity was afoot.

First, Sergeant Ostermeier knew that, only one hour earlier, two suspects fled on foot from a vehicle found in an elementary school parking lot two blocks away from Williams after evading law enforcement. He believed, based on his experience and training, that the Buick in which Williams was located could have been involved in aiding those suspects. Second, the officers observed Williams in the passenger seat of the parked and running vehicle in a residential area and knew that the driver had left the area on foot after parking. They thought this situation was indicative of drug dealing, prostitution, or human trafficking. Third, the officers observed Williams ducking and slouching in the passenger seat, as if trying to hide from police, and Sergeant Pynenberg also thought Williams could have been experiencing a medical event, such as a drug overdose. Defendants maintain that, based on the totality of the circumstances, Sergeants Ostermeier and Pynenberg were justified in instructing Williams to exit the Buick.

10

"[T]he Supreme Court has recognized that evasive behavior and flight are suggestive of wrongdoing and can be factors considered in a court's determination of whether an officer had reasonable suspicion to execute a *Terry* stop." *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125–26 (2006)). But a dispute of fact exists as to whether Williams was being evasive. According to Sergeants Ostermeier and Pynenberg, Williams was slouched or ducked down in the car, such that the officers could only see the top of his head. Williams, on the other hand, asserts that he was simply sleeping in the Buick. The bodycam footage does not capture Williams sitting in the vehicle, so the court cannot discern Williams' demeanor in the Buick. Because there are factual issues in dispute, such that a reasonable jury could find in either party's favor, the court cannot grant summary judgment on Williams' unlawful seizure claim as a matter of law.

## B. Qualified Immunity

Alternatively, Defendants argue that they are entitled to summary judgment under the doctrine of qualified immunity. Under this doctrine, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (cleaned up).

An individual's right to be free from unreasonable searches and seizures is clearly established. *See Sokolow*, 490 U.S. at 7. But genuine issues of material fact exist as to the alleged

11

deprivation of William's Fourth Amendment right to be free from an unlawful seizure. Because the qualified immunity inquiry cannot be disentangled from the disputed facts, qualified immunity must await resolution of the factual disputes regarding what Sergeants Ostermeier and Pynenberg claim to have seen to give them reason to suspect that crime was afoot. Defendants' motion must be denied on this basis as well.

### C. Failure to Intervene

Williams asserts that one or both of the officers failed to intervene to prevent the violation of his Fourth Amendment right. Williams cannot state a failure to intervene claim against Sergeants Ostermeier and Pynenberg because they were both personally involved in the seizure of Williams. *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1063 (E.D. Wis. 2015) ("An officer cannot intervene in his own constitutional violation."). Accordingly, Williams' failure to intervene claim must be dismissed.

### D. Indemnification

Williams also brought an indemnification claim against the City of Appleton pursuant to Wis. Stat. § 895.46. Because the underlying constitutional claim against the officers is proceeding, the indemnification claim against the City will not be dismissed. *See Williams v. Michalsen*, No. 19-cv-56, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020) ("If the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered.").

### E. Punitive Damages

Defendants argue that they are entitled to summary judgment on Williams' request for punitive damages. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v.*

*Wade*, 461 U.S. 30, 56 (1983). Defendants assert that they are entitled to summary judgment on Williams' punitive damages claim because there is no evidence that the officers took any action with malicious intent or reckless disregard for Williams' fundamental rights. But "evaluations of motive and intent are generally inappropriate on a motion for summary judgment." *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999) (internal citations omitted). A jury in this case could reasonably conclude that the officers acted with reckless or callous indifference to Williams' federally protected rights. Accordingly, the court declines to grant summary judgment on Williams' request for punitive damages.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 16) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted with respect to Williams' failure to intervene claim, and that claim is dismissed. The motion is denied in all other respects. Williams' cross-motion for partial summary judgment (Dkt. No. 22) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 3rd day of June, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
